# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 13-CV-03033 (JFB)

LEONARDO VALDEZ-CRUZ,

Petitioner,

VERSUS

STEVEN RACETTE, SUPERINTENDENT,
GREAT MEADOW CORRECTIONAL FACILITY,

Respondent.

**MEMORANDUM AND ORDER**
August 1, 2014

JOSEPH F. BIANCO, District Judge:

Leonardo Valdez-Cruz ("petitioner") petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction entered on June 14, 2010, in the Supreme Court of the State of New York, Nassau County (the "trial court"). Following a jury trial, petitioner was convicted of murder in the first degree, N.Y. Penal Law ("N.Y.P.L.") § 125.27(1)(a)(x); burglary in the second degree, N.Y.P.L. § 140.25(2); six counts of criminal contempt in the first degree, N.Y.P.L. § 215.51; criminal contempt in the second degree, N.Y.P.L. § 215.50(3); and criminal possession of stolen property in the fifth degree, N.Y.P.L. § 164.50. Petitioner was sentenced to an aggregate term of imprisonment of life without the possibility of parole.

In the instant case, petitioner challenges his conviction on the following grounds: (1) under *Batson v. Kentucky*, 476 U.S. 79 (1986), the trial court erroneously concluded that petitioner had failed to establish a *prima facie* case of race discrimination by the prosecution during voir dire; (2) the trial court's verdict was against the weight of the evidence; and (3) the trial court deprived petitioner of his constitutional right to present a defense at trial.

For the reasons set forth below, the petition for a writ of habeas corpus is denied in its entirety. Specifically, the Court concludes that petitioner's third claim is procedurally barred from habeas review. Moreover, the Court concludes that all of petitioner's claims, including the third claim, are without merit.

1

I. BACKGROUND

A. Factual Background

The Court has adduced the following facts from the instant petition and underlying record.

Petitioner and Joanna Bird ("Bird") met in 2002 and subsequently started a seven year relationship. (Tr.[1] at 789–90, 839–40, 1678–81.) Petitioner and Bird had a son together in March 2005. (Tr. at 788, 970.)

On May 27, 2008, petitioner was arrested, and an order of protection was issued requiring him to stay away from Bird. (Tr. at 761–62.) After barricading himself in Bird's apartment on June 28, 2008, petitioner was arrested for, *inter alia*, violating the order of protection. (Tr. at 925–26, 1132, 1163.) With respect to Bird, a second "stay away" order of protection was subsequently issued against petitioner. (Tr. at 397, 762–63.)

While incarcerated, petitioner continued to contact Bird by letter and by phone. (Exs.[2] 63–66, 115.) During these communications, petitioner both begged Bird to give their relationship a second chance and threatened her if she refused to take him back or if she started seeing someone else. (Tr. at 920–21; Ex. 64.) In a September 2008 letter to Bird, petitioner wrote, "It's not gonna KILL you to give me one last chance. It might KILL you if you don't." (*Id.*) In another September 2008 letter to Bird, petitioner drew a tombstone with the letters "R.I.P." and wrote the following:

---

[1] "Tr." refers to the transcript of petitioner's trial.
[2] "Ex." refers to the exhibits admitted in evidence at petitioner's trial. Petitioner does not contest the accuracy of the exhibits cited herein.

Joanna + another n***** = Joanna
A dead b**** who left behind 2 beautiful kids that really needed her more than anything in this whole world.

(Tr. at 920–21; Ex. 66.)

During a phone call on October 19, 2008, petitioner told Bird that he would be "stressed out" if she were to die instantly in a car crash because he would want her to "suffer." (Tr. at 1665, 1658; Ex. 115.) On two different occasions, petitioner explicitly told Bird that he was going to torture her. (Tr. at 1655, 1657; Ex. 115.) During a call on October 19, 2008, petitioner warned Bird that he was going to sit her up and make her watch as he stabbed off her genitals. (Tr. at 1651, 1655, 1658; Ex. 115.) On July 19, 2008, petitioner twice told Bird over the phone that he was going to "make her f****in' eyes pop out [of her] f****in' head." (*Id.*)

Following his release from jail, petitioner continued to violate the orders of protection by contacting Bird. (Tr. at 763–65.) By March 2009, petitioner started constantly appearing wherever Bird happened to be, would call her incessantly, and would regularly warn her that if she did not get back together with him he was going to kill her. (Tr. at 804–07, 815, 835–36, 982–86.)

On March 19, 2009, Sharon Dorsett ("Dorsett") received a frantic call at 12:31 p.m. from Bird, her daughter. (Tr. at 826–27, 892, 1009–12.) Bird was screaming, crying, and begging Dorsett to come help her. (*Id.*) Bird told Dorsett that she was trapped in her apartment with petitioner and could not get out. (*Id.*) In the background, Dorsett heard petitioner tell Bird that she would be

dead before her mother or the police arrived. (*Id.*)

Thereafter, Dorsett rushed over to Bird's apartment in Westbury with her other daughter, Melissa Johnson ("Johnson"). (Tr. at 827–28, 895, 901, 1012–15, 1041.) When they arrived at Bird's apartment, Dorsett and Johnson observed a car that petitioner often drove parked in the driveway. (*Id.*) After no one answered the door, Johnson called the police. (*Id.*) Police officers McQuade and Doerrie showed up to Bird's apartment minutes later. (*Id.*) Petitioner's sister, Chi Chi, subsequently arrived at the scene while on speakerphone with petitioner. (Tr. at 829–32, 914.) Johnson testified at trial that she overheard petitioner tell Chi Chi "that he did it," "that it was over," that "he did what he told her he was going to do," that she "was in the house" and "wasn't coming out," and that "he wasn't coming back." (*Id.*) Chi Chi eventually told Officer Doerrie that Bird was dead inside the house. (Tr. at 1088–89.) The police then broke down the front door and found Bird's lifeless body on the steps of her apartment. (Tr. at 832, 1092–93, 1144–47.)

Testimony from a taxi driver and cell phone records presented at trial indicated that petitioner's phone had traveled from Westbury to Manhattan—stopping in Hicksville, Hempstead and the Bronx—after Bird's death. (Tr. at 1295–97, 1493–95, 1497–98, 1505–06; Exs. 93–94, 98–99, 111–12.) Cell phone records also show that petitioner's phone and Bird's phone had activity within the range of the same Hempstead tower after Bird was killed. (Tr. at 1502–06; Exs. 102–03, 110–12.)

On March 20, 2008, petitioner surrendered to the police, with the help of his father and sister. (Tr. at 1624–27.) On the car ride back to police headquarters in Mineola, petitioner said to his father and sister the following: "What have I done? I'm going to jail for the rest of my life. I'm going to go to jail for twenty-five years to life." (Tr. at 1628.)

An autopsy was performed on Bird by Deputy Medical Examiner Dr. Brian O'Reilly ("Dr. O'Reilly") on March 20, 2009. (Tr. at 731.) Examinations of Bird's body revealed that she had significant injuries to her head and neck, including blunt force and sharp force injuries. (Tr. at 735–36, 742–43, 745.) The blunt force injury included multiple abrasions to Bird's face, with obvious swelling on both cheeks, contusions and abrasions surrounding her right ear, lacerations of the skin on the inside of her mouth, a laceration of her lower lip, and multiple contusions of her scalp, under her skin, and on her torso. (*Id.*)

The most significant of Bird's sharp force injuries was the gaping wound on the right side of her neck. (*Id.*) This wound, which Dr. O'Reilly opined at trial would have been caused by repeated twisting and hacking motions, transected Bird's windpipe, jugular vein, and sternomastoid muscle, perforated her esophagus, and left cuts on the front portion of her spinal column. (*Id.*) At trial, Dr. O'Reilly also testified that when Bird's windpipe was transected, she was forced to breath in and out of the hole in her neck. (Tr. at 739–40, 749–50.) In addition, Bird was stabbed on the left side of her neck, under her chin, and in the eyes. (Tr. at 737–38.) Dr. O'Reilly testified at trial that the hemorrhaging around the stab wounds of

her eyes indicated that Bird was still alive when she was stabbed there. (*Id.*)

Dr. O'Reilly explained at trial that Bird's death was a homicide, and that the cause of her death was multiple stab wounds to the head and neck. (Tr. at 747.) Dr. O'Reilly also testified that Bird probably remained alive for a few minutes after suffering such severe stab wounds. (*Id.*) Tests established that petitioner's sperm had been deposited into Bird's vagina within the twenty-four hours prior to the autopsy, which was performed at 8:30 a.m. (Tr. at 1552, 1546–50.)

B. Procedural History

Following a jury trial in the trial court, petitioner was convicted on June 10, 2014, of murder in the first degree, N.Y. Penal Law ("N.Y.P.L.") § 125.27(1)(a)(x); burglary in the second degree, N.Y.P.L. § 140.25(2); six counts of criminal contempt in the first degree, N.Y.P.L. § 215.51; criminal contempt in the second degree, N.Y.P.L. § 215.50(3); and criminal possession of stolen property in the fifth degree, N.Y.P.L. § 164.50. (Tr. 1872–77.) (*Id.*) Petitioner was sentenced to an aggregate term of imprisonment of life without the possibility of parole. (S.[3] at 20–21.)

On July 18, 2011, petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department ("Appellate Division"). He raised the following issues on appeal: (1) the trial court erred when it concluded, under *Batson*, that petitioner had failed to establish a *prima facie* case of race discrimination by the prosecutor during voir dire; (2) the quantity of prior bad act evidence that was introduced at trial deprived him of a fair trial; and (3) the evidence was legally insufficient and the verdict was against the weight of the evidence for his conviction of first-degree murder. (*See generally* Appellant's Brief.) On February 24, 2012, petitioner filed a *pro se* supplemental brief in which he raised a fourth claim contending that he was deprived of his constitutional right to present a defense at trial. (*See Pro Se* Supplemental Brief.)

The Appellate Division affirmed petitioner's judgment of conviction in a decision dated October 3, 2012. *See People v. Valdez-Cruz*, 951 N.Y.S.2d 582 (N.Y. App. Div. 2012). The Appellate Division held that: (1) the trial court concluded correctly that petitioner had failed to establish a *prima facie* case of race discrimination at voir dire; (2) petitioner's prior bad acts claim was without merit; (3) the evidence was legally sufficient to establish petitioner's guilt and the verdict of guilty for first-degree murder was not against the weight of the evidence; (4) petitioner's deprivation-of-his-constitutional-right-to-present-a-defense claim was unpreserved for appellate review because he had not advanced it at trial. *Id.* at 583–84.

On November 20, 2012, petitioner filed an application with the New York Court of Appeals for leave to appeal from the Appellate Division's order on his *Batson* and legal sufficiency claims. (*See* Application for Leave to Appeal.) The Court of Appeals denied petitioner's application for leave to appeal on December 19, 2012. *See People v. Valdez-Cruz*, 20 N.Y.3d 989 (2012).

---

[3] "S." refers to the transcript of petitioner's sentencing.

4

On May 7, 2013, petitioner, proceeding *pro se*, filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner claims that: (1) he was denied his right to a fair trial under *Batson*; (2) the trial court's verdict was against the weight of the evidence; and (3) he was deprived of his constitutional right to present a defense at trial. (Pet. [4] at 6–7, 9.) Respondent filed its memorandum of law in opposition to the petition on August 26, 2013. Petitioner filed a traverse on March 5, 2014. The Court has fully considered the arguments and submissions of the parties.

II. STANDARD OF REVIEW

A. Legal Standard

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

---

[4] "Pet." refers to petitioner's habeas corpus petition submitted in this Court.

> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411).

Additionally, while "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

III. DISCUSSION

Petitioner argues he is entitled to habeas relief on three grounds: (1) he was denied his right to a fair trial because of the trial court's *Batson* determination; (2) the trial court's verdict was against the weight of the evidence; and (3) he was deprived of his constitutional right to present a defense at trial. (Pet. at 6–7, 9.) Respondent argues that petitioner's third claim is procedurally barred from habeas review and that all of his claims are without merit. (Resp't Br.[5] at 5–29.)

The Court agrees that petitioner's third claim is procedurally barred from habeas review. However, in an abundance of caution, the Court has analyzed the merits of all claims. As set forth below, the Court finds that all of petitioner's claims are without merit and therefore denies the petition in its entirety on the merits.

---

[5] "Resp't Br." refers to respondent's brief in opposition to the instant petition.

A. Procedural Bar

1. Legal Standard

A petitioner's federal claims may be procedurally barred from habeas review if they were decided at the state level on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729–33 (1991); *see, e.g.*, *Michigan v. Long*, 463 U.S. 1032, 1041 (1983). The procedural rule at issue is adequate if it is "firmly established and regularly followed by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (internal quotation marks omitted). To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case," by "clearly and expressly stat[ing] that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 261–63 (1989) (internal quotation marks omitted). In addition, a state court's reliance on an independent and adequate procedural bar precludes habeas review even if the state court also rejected the claim on the merits in the alternative. *See, e.g.*, *id.* at 264 n.10 (holding that "a state court need not fear reaching the merits of a federal claim in an *alternative* holding," so long as the state court "explicitly invokes a state procedural bar rule as a separate basis for decision" (emphasis in original)); *Glenn v. Bartlett*, 98 F.3d 721, 725 (2d Cir. 1996) (same).

The procedural bar is based on the "comity and respect" that state judgments must be accorded. *House v. Bell*, 547 U.S. 518, 536 (2006). Its purpose is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees

6

fit. *Coleman*, 501 U.S. at 730–31. Generally, the Second Circuit has deferred to state findings of procedural default as long as they are supported by a "fair and substantial basis" in state law. *Garcia*, 188 F.3d at 78. However, there is a "small category" of "exceptional cases in which [an] exorbitant application of a generally sound [procedural] rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376, 381 (2002). Nevertheless, principles of comity "counsel that a federal court that deems a state procedural rule inadequate should not reach that conclusion lightly or without clear support in state law." *Garcia*, 188 F.3d at 77 (citation and internal quotation marks omitted).

If a claim is procedurally barred, a federal habeas court may not review it on the merits unless the petitioner demonstrates both cause for the default and prejudice resulting therefrom, or if he demonstrates that the failure to consider the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 750. A petitioner may demonstrate cause by showing one of the following: "(1) the factual or legal basis for a petitioner's claim was not reasonably available to counsel, (2) some interference by state officials made compliance with the procedural rule impracticable, or (3) the procedural default was the result of ineffective assistance of counsel." *McLeod v. Graham*, No. 10 Civ. 3778, 2010 WL 5125317, at *3 (E.D.N.Y Dec. 9, 2010) (citing *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994)). Such prejudice can be demonstrated by showing that the error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (citation and internal quotation marks omitted). A miscarriage of justice is demonstrated in extraordinary cases, such as where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To overcome a procedural default based on a miscarriage of justice, the petitioner must demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 536–38.

2. Application

Petitioner argues that he was deprived of his constitutional right to present a defense at trial when the trial court denied his application to introduce tape recordings of telephone calls that petitioner had made to Bird. (Pet. at 8.) The Appellate Division denied petitioner's constitutional claim by ruling that it was unpreserved for appellate review because petitioner had not made this argument at trial. *Valdez-Cruz*, 951 N.Y.S.2d at 584 (citing *People v. Haddock*, 917 N.Y.S.2d 634 (N.Y. App. Div. 2010); *People v. Simon*, 775 N.Y.S.2d 169 (N.Y. App. Div. 2004)).

Failure to preserve an issue for state appellate review by not raising a constitutional claim before the trial court or failing to object to the trial court's denial of an evidentiary application is an adequate and independent procedural ground recognized in New York State. *See* N.Y. Crim. Proc. Law § 470.05; *Murray*, 477 U.S. at 485–93 (contemporaneous objection rule); *Wainwright v. Sykes*, 433 U.S. 72, 86–92

7

(1977) (contemporaneous objection rule is an independent and adequate state ground); *Glenn v. Bartlett*, 98 F.3d 721, 724–26 (2d Cir. 1996); *Owens v. Portuondo*, No. 98-CV-6559 (AJP), 1999 WL 378343, at *6 (S.D.N.Y. June 9, 1999) (citing cases), *aff'd*, 205 F.3d 1324 (2d Cir. 2000); *Torres v. Irvin*, 33 F. Supp. 2d 257, 263–65, 273–75 (S.D.N.Y. 1998); *Vera v. Hanslmaier*, 928 F. Supp. 278, 285 (S.D.N.Y. 1996) ("Failure to object at trial is an independent and adequate state procedural bar."); *Jamison v. Smith*, No. 98-CV-3747 (FB), 1995 WL 468279, at *2 (E.D.N.Y. July 26, 1995) ("Courts in this circuit have consistently held that the failure to object contemporaneously . . . constitutes an adequate and independent basis for barring *habeas* review."); *Anderson v. Senkowski*, No. 92-CV-1007, 1992 WL 225576, at *4 (E.D.N.Y. Sept. 3, 1992), *aff'd*, 992 F.2d 320 (2d Cir. 1993). As stated *supra,* the Appellate Division held that this claim was unpreserved for review. *Valdez-Cruz*, 951 N.Y.S.2d at 584. Because the Appellate Division denied petitioner's claim on an independent and adequate state law ground, the Court is procedurally barred from reviewing this claim.

Moreover, petitioner has demonstrated neither "cause and prejudice" for his procedural default, nor a miscarriage of justice that would result from the failure to consider his claim. In his petition, petitioner has wholly failed to explain why neither he nor his counsel registered any objection when the trial court denied his evidentiary application. In addition, petitioner has failed to demonstrate any prejudice because, as discussed *infra*, he has failed to articulate what portions of the recordings would have been helpful to him, or the basis for their admissibility, or how such portions could undermine the overwhelming evidence of his guilt. Accordingly, this claim is procedurally barred from federal habeas corpus review.

B. Merits Analysis

Although petitioner's deprivation-of-his-constitutional-right-to-present-a-defense claim is procedurally barred from habeas review, the Court, in an abundance of caution, has analyzed the merits of all of petitioner's claims and concludes, for the reasons discussed below, that they are without merit.

1. *Batson* Claim

a. Legal Standard

"[W]hen reviewing a *Batson* challenge in the context of a habeas petition, a trial court's conclusion that a peremptory challenge was not exercised in a discriminatory manner is entitled to a presumption of correctness, except, *inter alia,* to the extent that the trial court did not resolve the factual issues involved in the challenge or if the finding is not fairly supported by the record." *Galarza v. Keane*, 252 F.3d 630, 635 (2d Cir. 2001). In *Batson,* the Supreme Court set forth a three-part test for a trial court evaluating whether peremptory challenges were exercised in a discriminatory manner: (1) "a trial court must decide whether the party challenging the strike has made a *prima facie* showing that the circumstances give rise to an inference that a member of the *venire* was struck because of his or her race"; (2) "[i]f the party making the *Batson* challenge establishes a *prima facie* case, the trial court must require the nonmoving party to proffer a race-

neutral explanation for striking the potential juror"; and (3) "if the non-moving party proffers a race-neutral explanation, the trial court must determine whether the moving party has carried his or her burden of proving that the strike was motivated by purposeful discrimination." *Id.* at 635–36 (citing *Batson*, 476 U.S. at 96–98).

In *Batson*, the Supreme Court stated that there are three components to establishing a *prima facie* case. *See* 476 U.S. at 96. First, the moving party must show that he is "a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* (internal citation omitted). Second, the party bringing the *Batson* challenge may rely on the fact "that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of the mind to discriminate.'" *Id.* (citing *Avery v. Georgia*, 345 U.S. 559, 562 (1953)). Third, the moving party "must show that these facts and any other relevant circumstances raise an inference that the prosecutor used the practice to exclude the veniremen from the petit jury on account of their race." *Id.* The Court in *Batson* also noted that, when deciding whether or not a party that brings a *Batson* challenge has made a *prima facie* showing, all relevant circumstances should be considered by the trial court. *Id.*

"Throughout the *Batson* procedure, the burden of proving that a strike was exercised on an impermissible discriminatory ground remains with the movant." *Messiah v. Duncan*, 435 F.3d 186, 195 (2d Cir. 2006).

b. Application

Petitioner claims that he was denied his fundamental right to a fair trial because the trial court erred when it held that he had failed to establish a *prima facie* case of race discrimination during voir dire. (Pet. at 6.) More specifically, petitioner claims that the trial court's failure to move to step two of the *Batson* analysis and require the prosecutor to provide a race-neutral explanation for the removal of African American prospective jurors was a violation of petitioner's right to equal protection under the law.[6] (*Id.*) His claim relates to the following exchange at trial. After the prosecution sought to exercise a peremptory challenge to excuse Lee, an African American prospective juror, the judge asked whether any African American jurors had been selected as jurors. (Tr. at 605.) Defense counsel indicated that an African American already had been selected as a juror but explained that this was not a relevant inquiry because a *Batson* objection could be raised based upon the exclusion of a single prospective juror. (Tr. at 605–06.) Defense counsel supplemented his objection by noting that five other prospective jurors who were also African American had already been excused. (Tr. at 605–06.) Defense counsel then contended, "it's now the Court's discretion to ask [the prosecutor]

---

[6] In his petition, petitioner argues that the prosecutor should have been required to explain race-neutral reasons for excluding a number of African American jurors. (Pet. at 6.) However, the *Batson* challenge that was advanced before the trial court pertained to a single prospective juror, Danita Lee ("Lee"). (Tr. at 605.) The remaining prospective African American jurors were mentioned only in support of petitioner's *Batson* challenge as to Lee. (Tr. at 605–06, 615–16.)

9

her racially neutral reason." (Tr. at 606.) In response, the prosecutor argued that defense counsel had not made a *prima facie* showing of discrimination (*Id.*) The trial court agreed and denied defense counsel's *Batson* objection. (*Id.*)

The trial court properly concluded that petitioner had failed to establish a *prima facie* case of discrimination under *Batson*. Merely asking for a race neutral explanation, without any additional support or argument, is not enough to meet the defendant's burden of making a *prima facie* case under *Batson. See, e.g.*, *Anderson v. Superintendent of Elmira Corr. Facility*, No. 05–1586–pr, 2008 WL 162842, at *2 (2d Cir. Jan. 18, 2008) (summary order) (concluding that a state court's rejection of a *Batson* claim when defense counsel insufficiently articulated the reasons for his challenge before the New York Supreme Court was not an unreasonable application of clearly established federal law); *Cousin v. Bennett*, 511 F.3d 334, 339 n.1 (2d Cir. 2008) ("Petitioner also argues that a *prima facie* case was made because there was no obvious reason for the government to challenge Smith. This argument is unavailing. The absence of an obvious race-neutral reason for excluding a juror is not sufficient to establish a *prima facie* showing of racial motivation. A party's valid reasons for exercising a peremptory challenge are often not apparent without explanation, and explanation is not required unless a *prima facie* showing of an improper motivation has been made." (internal citations omitted)); *Rosario v. Burge*, 542 F. Supp. 2d 328, 340–42 (S.D.N.Y. 2008) (denying habeas relief when state court rejected *Batson* claim due to defense counsel's failure to make out a *prima facie* case, when she merely requested a non-race-based reason for exclusion of certain jurors); *Butler v. Fischer*, No. 02-CV-5733 (KMK)(KNF), 2008 WL 3338202, at *6–7 (S.D.N.Y. Aug. 8, 2008) (concluding that there was no unreasonable application of clearly established federal law when trial judge did not require the prosecutor to articulate a non-race-based reason for exercising peremptory challenge after defense counsel failed to make a *prima facie* case under *Batson*), *aff'd*, 345 F. App'x 642 (2d Cir. 2009); *accord United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990) ("In making out a prima facie case, 'the defendant must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal.'" (quoting *United States v. Young-Bey*, 893 F.2d 178, 179 (8th Cir. 1990))). Moreover, the prosecutor's exercise of peremptory challenges to excuse six African American prospective jurors, out of a seventy-eight-person venire having an unknown racial composition, without more, does not establish a *prima facie* case of discrimination under *Batson. See, e.g.*, *Rosario*, 542 F. Supp. 2d at 341 ("'[O]nly a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination.'" (quoting *United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir. 1991))); *Copeland v. Walker*, 258 F. Supp. 2d 105, 123 (E.D.N.Y. 2003) ("While statistics alone may be sufficient to establish a *prima facie* case of discrimination in 'appropriate circumstances,' petitioner bears 'the burden of articulating and developing the factual and legal grounds supporting his *Batson* challenge before the trial court.' . . . As in *Overton*, petitioner did not address or call to the attention of the

trial judge crucial information surrounding the statistics, such as the total racial makeup of the venire, the number of minorities who actually sat on the jury, and the number of minorities who were not challenged by the prosecutor." (quoting *Overton v. Newton*, 295 F.3d 270 (2d Cir. 2002))); *see also Butler*, 2008 WL 3338202, at *7 ("[I]t is not the role of the habeas court to speculate about circumstances outside the record that hypothetically could have supported a prima facie case."); *accord United States v. Williamson*, 53 F.3d 1500 (10th Cir. 1995) (presence of minorities on jury as finally sworn was relevant to *prima facie* case determination); *Deputy v. Taylor*, 19 F.3d 1485, 1492–93 (3d Cir. 1994) (number of minorities in the venire as a whole was relevant to *prima facie* case).

Additionally, the record also suggests legitimate, race-neutral reasons for the prosecutor to have used a peremptory challenge to excuse prospective juror Lee. Most significantly, Lee stated that she would vote to convict petitioner only if she were "thoroughly convinced" of his guilt and the prosecution had proven his guilt "beyond a doubt." (Tr. at 565.) Concerned that she might have held the prosecution to a higher standard of proof, the prosecutor explained to Lee that the standard of proof is beyond a reasonable doubt, not any doubt. (Tr. at 566.) The trial court even felt it necessary to further explore Lee's understanding of the burden of proof by defining reasonable doubt. (*Id.*) Still somewhat concerned, the prosecutor asked Lee if she would be able to follow the trial court's instructions on the burden of proof while deliberating, and she vaguely replied: "You never know, but you know—just look at the evidence and see what makes sense." (Tr. at 567.)

In sum, the Court determines that petitioner has failed to meet his burden to demonstrate that the denial of his *Batson* claim in the trial court involved an unreasonable application of federal law, or an unreasonable determination of the facts. Accordingly, petitioner is not entitled to habeas relief on this basis.

2. Sufficiency of the Evidence Claim

Petitioner claims that his conviction of murder in the first degree was against the weight of the evidence. (Pet. at 7.) As an initial matter, "weight of evidence" is the name of a specific claim under New York state law and, thus, is not cognizable on federal habeas review. *See, e.g.*, *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). However, the Court will construe the *pro se* petition as asserting a sufficiency of the evidence claim under the Fourteenth Amendment's Due Process Clause.[7] *See Einaugler v. Supreme Court of the State of N.Y.*, 109 F.3d 836, 839 (2d Cir. 1997) (stating that due process prohibits "conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the

---

[7] Indeed, in petitioner's traverse, he re-phrased his "verdict against the weight of the evidence claim" as an "insufficiency of the evidence challenge." (Traverse at 19–21.)

defendant] is charged.'" (quoting *In re Winship*, 397 U.S. 358, 364 (1970))).

With respect to this claim, the Appellate Division ruled on the merits that the evidence at petitioner's trial was "legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Valdez-Cruz*, 951 N.Y.S.2d at 584. For the reasons set forth below, the Court concludes that this ruling was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the entire record. Thus, this claim does not entitle petitioner to habeas relief.

a. Legal Standard

The law governing habeas relief from a state conviction based on insufficiency of evidence is well established. A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler*, 109 F.3d at 840. A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see, e.g.*, *Flowers v. Fisher*, 296 F. App'x 208, 210 (2d Cir. 2008) (summary order); *Policano v. Herbert*, 507 F.3d 111, 115–16 (2d Cir. 2007); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). A criminal conviction will stand so long as "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (internal quotation marks omitted) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326).

When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999). Accordingly, in this case, the Court looks to New York law for the elements of murder in the first degree. Under the relevant New York law, "[a] person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person; and . . . the defendant acted in an especially cruel and wanton manner pursuant to a course of conduct intended to inflict and inflicting torture upon the victim prior to the victim's death." N.Y.P.L. § 125.27(a)(1)(x). [8] Torture is defined as "intentional and depraved infliction of extreme pain," and "depraved means the defendant relished the infliction of extreme physical pain upon the victim evidencing debasement or perversion or that the defendant evidenced a sense of pleasure in the infliction of extreme physical pain." *Id.*

---

[8] In addition, a person is guilty of murder in the first degree only if he "was more than eighteen years old at the time of the commission of the crime." N.Y.P.L. § 125.27(1)(b).

12

b. Application

Petitioner argues that the evidence was legally insufficient to support his conviction of murder in the first degree. (Traverse at 19.) Specifically, petitioner claims that the evidence was legally insufficient to establish the element of torture that distinguishes murder in the first degree from murder in the second degree. (*Id.*) In support of his argument, petitioner contends that there was "no eyewitness testimony as to the manner and timing of the victim's death," there were "no videotapes or still photos" that established torture, and the medical examiner did not testify "as to the time of the victim's death and which injury resulted in her death." (Pet. at 7.)

The Court concludes that there was more than sufficient evidence presented at trial that would allow a rational trier of fact to conclude beyond a reasonable doubt that petitioner tortured Bird. With respect to the infliction of torture, the jurors heard testimony from the medical examiner regarding several substantially painful injuries sustained by Bird prior to her death. (Tr. at 735–38, 740–41, 747.) In particular, based on the hemorrhaging around Bird's wounds, the medical examiner opined that Bird was still alive when she was stabbed in the eyes. (Tr. at 737–38.) In addition, the medical examiner explained that when Bird's windpipe was transected, she was forced to breathe out of a gaping hole in her neck for a few minutes before she died. (Tr. at 739–40, 749–50.) The medical examiner also opined that petitioner had inflicted this gruesome tracheal wound by using a hacking and twisting motion. (Tr. at 741, 746–47.) With respect to the intentionality and depravity of the torture, the jurors heard evidence at trial of numerous conversations between petitioner and Bird establishing that he wanted her to suffer. (Tr. at 1651, 1655, 1657–58; Ex. 115.) During a recorded phone call made by petitioner from jail on October 19, 2008, petitioner told Bird that he would be "stressed out" if she were to die instantly in a car crash because he would want her to "suffer." (*Id.*) In two separate instances, petitioner even explicitly told Bird that he was going to torture her. (*Id.*) He also warned her that he was going to sit her up and make her watch as he stabbed off her genitals. (*Id.*) On July 19, 2008, foreshadowing what he would eventually do to her, petitioner twice told Bird that he was going to "make her f****in' eyes pop out [of her] f****in' head." (*Id.*)

Given the painful nature of the injuries inflicted, the manner in which they were inflicted, and petitioner's recurrent threats to Bird that he was going to torture her, a rational trier of fact could have concluded beyond a reasonable doubt that petitioner intended to and did torture Bird. *See, e.g.*, *Williams v. Lempke*, No. 11-CV-2504 (PGG)(JLC), 2012 WL 2086955, at *19 (S.D.N.Y. June 1, 2012) (report & recommendation) (finding sufficient evidence that petitioner had "'relished' or took pleasure in inflicting pain," such that torture element of first degree murder was satisfied, from petitioner's "sadistic and prolonged dealings with [the victim]," "the bizarre and needlessly brutal techniques he selected for assaulting the victim, which included throwing boiling water on her, slashing at her eyes with a kitchen knife, throwing bleach in her face, force-feeding her medication, and setting her apartment on fire, not all at once, but in a drawn-out manner over many hours," and "from his remarks to the victim that

13

she was 'not good enough' for a quick death"). Accordingly, petitioner is not entitled to habeas relief on this ground.

### 3. Evidentiary Ruling

Petitioner claims that he was deprived of his constitutional right to present a defense at trial when the trial court denied his application to introduce tape recordings of phone calls that he had made to Bird. The Appellate Division found this issue unpreserved. *Valdez-Cruz*, 951 N.Y.S.2d at 584. As previously stated, the Appellate Division's ruling procedurally bars this claim from habeas review. However, in an abundance of caution, the Court considers the merits of this claim and, for the reasons set forth below, concludes this claim is without merit.

### a. Legal Standard

It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983). *See generally Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[H]abeas corpus relief does not lie for errors of state law." (citations omitted)). Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, the petitioner must "show that the error deprived her of a fundamentally fair trial." *Taylor*, 708 F.2d at 891; *see also Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'" (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (internal quotation marks omitted))). In other words, "[t]he introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal quotation marks omitted)).

To constitute a denial of due process under this standard, the erroneously admitted evidence must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (internal quotation marks omitted)); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (holding that evidence must be "crucial, critical, highly significant" (internal quotation marks omitted)). Moreover, the court "must review the erroneously admitted evidence 'in light of the entire record before the jury.'" *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d at 181 (internal quotation marks omitted)). In making this due process determination, the Court should engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under New York State law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *Wade v. Mantello*, 333 F.3d 51, 59 (2d Cir. 2003); *Davis v. Strack*, 270 F.3d 111, 123–24 (2d Cir. 2001).

b. Application

The Court has reviewed the trial court's evidentiary ruling to which petitioner objects under this two-part test and concludes that petitioner's claim lacks merit. As a threshold matter, there is no basis to conclude that the trial court's denial of petitioner's application to introduce unspecified recorded phone conversations was erroneous under state law. Petitioner's counsel did not identify which of the 170 recordings would have "complete[ed] the narrative" or "give[n] the jury [a] whole and accurate picture." (Tr. at 1659–60.) Not only did he fail to explain what he meant by "complete the narrative" or "give the jury a whole and accurate picture," he did not even specify how the content of any of the recorded phone conversations could "complete the narrative" or "give the jury a whole and accurate picture." (*Id.*) Even assuming *arguendo* that the unspecified recorded phone conversations would have helped the defense, petitioner has never articulated a legal basis to warrant their admission.

Furthermore, even if the denial of petitioner's application to introduce unspecified phone recordings was erroneous under state law, there is no basis for the Court to conclude that this error substantially harmed petitioner and thus deprived him of his constitutional right to a fair trial. Petitioner has failed to explain the content of the phone calls he sought to admit, and, therefore, the materiality of this evidence is completely unknown. Accordingly, he has not met his burden to show that the trial court's ruling precluding him from introducing certain phone calls in evidence deprived him of a fundamentally fair trial. Petitioner has presented no basis upon which this Court could conclude that he was prevented from introducing certain phone call recordings that would have had any impact on the jury's verdict. The record contains overwhelming evidence of petitioner's guilt. The jury heard uncontroverted evidence that petitioner repeatedly threatened to torture and kill Bird in the months preceding her death. (Tr. at 920–21, 1651, 1655, 1657–58; Exs. 63–66, 115.) Evidence was introduced at trial that petitioner deposited sperm in Bird on the morning of her death. (Tr. at 1552, 1546–50.) Furthermore, the jury heard evidence that petitioner had been with Bird shortly before her death and had warned her that she would soon be dead. (Tr. at 1009–12.) The jury also heard evidence that petitioner had Bird's cell phone and fled to Manhattan immediately after her death. (Tr. at 1497–98, 1502–06; Exs. 102–03, 110–12.) Lastly, evidence was presented at trial that petitioner made the following statement to his father and sister after surrendering to the police: "What have I done? I'm going to jail for the rest of my life." (Tr. at 1628.) Therefore, even if the recorded phone conversations plaintiff sought to admit were admitted in evidence, the evidence of petitioner's guilt was overwhelming in this case.

In sum, the trial court's ruling denying petitioner's application to introduce unspecified phone recordings was neither contrary to, nor an unreasonable application of, clearly established federal law. In addition to being procedurally barred, this claim is patently without merit because, when viewing the record as a whole, there is no basis to conclude that a permissible use of this excluded evidence would have created a reasonable doubt in the jury's mind that did not otherwise exist,

in light of his failure to articulate what portions would have been helpful, how they would have been admissible, or how such portions would have undermined, in any way, the overwhelming evidence of his guilt. Accordingly, petitioner is not entitled to habeas relief on this ground.

### III. CONCLUSION

For the foregoing reasons, petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254. Petitioner has failed to point to any state court ruling that was contrary to, or an unreasonable application of, clearly established federal law, or that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The Court has reviewed all of petitioner's claims and finds them to be without merit. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 1, 2014
      Central Islip, NY

\* \* \*

Petitioner proceeds *pro se*. Respondent is represented by Kathleen M. Rice, District Attorney, Nassau County, by Tammy J. Smiley and Jacqueline Rosenblum, Assistant District Attorneys, Nassau County District Attorney's Office, 262 Old Country Road, Mineola, NY 11501.